**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION**

| | | |
|---|---|---|
| **ANDREW RAY CASE,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 7:13-CV-00011-BL** |
| | § | |
| | § | |
| **CAROLYN W. COLVIN,** | § | |
| **Acting Commissioner of Social Security,** | § | |
| | § | |
| **Defendant** | § | **Assigned to U.S. Magistrate Judge** |

## MEMORANDUM OPINION AND ORDER OF DISMISSAL

Pursuant to 42 U.S.C. § 405(g), Plaintiff Andrew Ray Case seeks judicial review of the Commissioner of Social Security's decision, which denied his applications for a period of disability, disability insurance benefits, and supplemental security income benefits under Titles II and XVI of the Social Security Act. The United States district judge transferred this case to the United States magistrate judge and all parties consented to the jurisdiction of the magistrate judge.

After considering the pleadings, the briefs, and the administrative record, this Court affirms the Commissioner's decision and dismisses, with prejudice, Case's complaint.

### Statement of the Case

Following a hearing on May 3, 2011, an Administrative Law Judge (ALJ) determined on June 23, 2011, that McFarland was not disabled. Specifically, the ALJ held that Case's impairments did not meet or equal any of the impairments listed in Appendix 1 of the governing regulations, that he had the residual functional capacity (RFC) to perform a wide range of

sedentary work, and that although he was not capable of performing his past relevant work, he was capable of performing other jobs existing in significant numbers in the national economy. The Appeals Council denied review on October 1, 2012. Therefore, the ALJ's decision is the Commissioner's final decision and is properly before the Court for review. *See Higginbotham v. Barnhart*, 405 F.3d 332, 334 (5th Cir. 2005) (stating Commissioner's final decision "includes the Appeals Council's denial of [a claimant's] request for review").

## **Factual Background**

Case filed an application for a period of disability, disability insurance benefits, and supplemental security income on July 22, 2009. (Tr. 8, 16, 134). Case claims he became disabled on July 17, 2009 (hereinafter date of onset), due to herniated discs at L4 and L5, severe back pain, spinal stenosis, hypertension, carpal tunnel syndrome, mental limitations, and disc bulges and foraminal narrowing of several vertebrae. (Tr. 8-9, 37, 59, 60, 61,63, 70, 74, 75, 134, 138). Previously, Case worked as a cashier, sales associate, pricing coordinator, office manager, mental health worker, and a psychiatric nurse's aide. (Tr. 139, 147). Case has a twelfth grade education and completed training to become an MHMR technician. (Tr. 37, 144-45).

Prior to the date of onset, Case obtained treatment for the various conditions he alleges are disabling. (Tr. 104-142, 170). In April 2008, Case was hit by a motor vehicle while riding his bicycle; his back pain started shortly thereafter. (Tr. 261). Between July and October of 2008, Case visited Dr. Maniago, M.D., for severe back pain. (Tr. 202). Case also visited Pain Rehab Group (Pain Rehab) several times between July 2008 and November 2009, and again between January 2010 and February 2011. (Tr. 238-70, 293-312).

During Case's numerous visits to Pain Rehab, he was under the care of Dr. Herren, M.D. (Tr. 238-70). These many visits were to evaluate, control, and treat Case's lower back pain. (Tr.

238-70). On July 22, 2008, the back pain seemed to progressively radiate toward his left lower extremity. (Tr. 261). This pain caused Case some difficulty ambulating. (Tr. 261). X-rays ordered by Dr. Maniago shortly after the incident revealed no compression fractures, but did show that Case had some "degenerative changes at L4/5, and L5/S1." (Tr. 207, 261). An MRI scan done in May of 2008 revealed that Case had an L4/5 disc protrusion that was impinging the exiting nerve roots. (Tr. 205, 261). Severe right foraminal stenosis was also noted at L5/S1 along with hypertrophic changes of the facet joint. (Tr. 261). Case stated at this visit that his pain was a 9 on a 10 point scale, and ranges between a 7 and a 10 on the same scale. (Tr. 261). Case admitted his pain was alleviated when lying down but worsened during ambulation, moving about, and sitting. (Tr. 261). Dr. Herren did note that Case had a mild deterioration of strength. (Tr. 261). Case's medical history included hypertension, high cholesterol, asthma, major depression, and right carpel tunnel syndrome. (Tr. 262). Physical exam revealed that Case had "significant pain with palpatory examination of the lumbar paraspinal musculature particularly in the left lumbosacral triangle region." (Tr. 264). A straight leg test was mildly positive on the right. (Tr. 264). Dr. Herren then recommended that Case receive 3 lumbar epidural steroid injections in order to alleviate Case's symptoms. (Tr. 264).  Medical records indicate that Case received one steroid injection in August 2008, and two in September 2008. (Tr. 258, 259, 260).

On October 20, 2008, Case followed up with Dr. Herren at Pain Rehab for a re-evaluation of back and right leg pain. (Tr. 257). At this visit, Case claimed that the epidural steroid injections he received earlier did not provide any relief. (Tr. 257). Notably, Dr. Herren reported that Case's straight leg raises were negative bilaterally and he had normal strength. (Tr. 257). On November 17, 2008, Case again returned to Dr. Herren for a follow up after the previous visit in October. (Tr. 256). At this visit, Dr. Herren re-evaluated Case's symptoms and placed him on

different medications for better pain management. (Tr. 256). On December 31, 2008, Case returned to Dr. Herren with complaints of chronic pain, and new pain symptoms on his right side. (Tr. 254). After reviewing an MRI scan, Dr. Herren opined that a transforaminal route injection may afford Case more relief from chronic pain. (Tr. 254). In January and February 2009, Case received the transforaminal lumbar epidural injection as prescribed by Dr. Herren. (Tr. 251, 252, 253).

In an April 2009 follow up visit to Pain Rehab, Dr. Herren noted that Case reported excellent relief after the second round of injections, but had since experienced some recurring pain. (Tr. 249).  This pain was reported at a 7 on a 10 point scale. (Tr. 249). Physical exam revealed "moderate pain and discomfort across the lower lumbar region and pain into the right lower extremity." (Tr. 249). Case's straight leg exam was "mildly positive on the right and negative on the left." (Tr. 249). In July 2009, Case returned to Dr. Herren for a follow up visit where he reported that an incident where he was pushed into a wall two weeks earlier exacerbated his pain and caused his back to spasm. (Tr. 247). Case reported the post-incident pain to be a 9 on a 10 point scale. (Tr. 247). Physical examination at this visit revealed diaphoresis, hypertonic musculature in the lower lumbar region, and a positive left straight leg exam. (Tr. 247). Dr. Herren recommended a single transforaminal epidural steroid injection, which Case received on July 20, 2009. (Tr. 246-47). Case returned to Dr. Herren one week after the injection and reported that he only enjoyed a short-lived relief from the pain. (Tr. 245).

In October 2009, Case returned to Pain Rehab where he was treated by Dr. Robert Robey. (Tr. 240-243). At this visit, Case continued to complain of pain in his back and lower extremities. (Tr. 240). Physical exam of the thoracolumbar area revealed a full range of motion,

negative Patrick's test,[1] a negative straight leg raise, no tenderness on palpitation of bony structures, and paraspinous tenderness upon palpitation of the soft tissue. (Tr. 241). Dr. Robey also noted that Case had 5/5 muscle extension and 2+ stretch reflexes in his lower extremities. (Tr. 241).

In January 2010, Case returned to Pain Rehab complaining of back pain. (Tr. 310-12). In the progress report from this visit, Dr. Herren stated that it may be possible that Case was selling his medication—an allegation Case denied. (Tr. 310). Physical exam of the thoracolumbar area revealed a decreased range of motion and tenderness of the bony structures. (Tr. 311). Case revisited Pain Rehab in March, May, June, August, and November of 2010, and February 2011. (Tr. 293-310). Each of these visits was for treatment of his back pain. (Tr. 293-310). In March 2010, a thoracolumbar physical exam revealed Case had "very stiff movements and leans on his cane. Sit to stand transition is slow." (Tr. 308). However, Dr. Herren also stated that he witnessed Case carrying his cane in his hand—making no use of it—in the parking lot of the clinic. (Tr. 308). Physical exam of the thoracolumbar region in August 2010 revealed a decreased range of motion, negative straight leg test, and tenderness of the bony structures upon palpation. (Tr. 301). Notably, in his November 2010 visit with Dr. Herren, a physical exam of the thoracolumbar region revealed a full range of motion, tenderness of the bony structures upon palpation, and tenderness of the soft tissue upon palpation. (Tr. 298). Finally, a physical exam of the thoracolumbar region conducted in February 2011 revealed a decreased range of motion, a negative Patrick's test, positive straight leg raise, right radiculopathy when seated, no tenderness upon palpation of bony structures, and tenderness upon palpation of soft tissue. (Tr. 294). Additionally, all muscle tests scored a 5/5, and all stretch reflexes scored a 2+. (Tr. 294). The

---

[1] *Patrick's Test* is a test "to determine the presence or absence of sacroiliac disease." STEDMAN'S MEDICAL DICTIONARY 1806 (27th ed. 2000).

doctor did note that Case "[t]alks about pain in an excessive manner." (Tr. 294).

In July 2009, Dr. Maniago sent Case to the Texas Back Institute, where he was seen by Dr. Stephen Hochschuler, M.D. (Tr. 200-01). During this visit, Dr. Hochschuler noted that Case had an increase in pain and that he was advised to stop working. (Tr. 201). Dr. Hochschuler also recommended that Case receive epidural injections, although there is no indication in the record that Case actually received this treatment from Dr. Hochschuler. (Tr. 200-01).

Between June 2010 and July 2010, Case visited Dr. Gleason, a neurosurgeon, for his back pain. (Tr. 287-92). Records from Dr. Gleason indicate that Case had an MRI scan done in April 2010 which showed "severe disc degeneration at L4-5 and a disc herniation at the same level." (Tr. 288).

Between October 2009 and February 2011, Case visited Helen Farabee MHMR centers for his mental health issues. (Tr. 313-71). Case's first visit, dated October 28, 2009, came shortly after his denial for disability benefits. (Tr. 371). At this visit, Case complained he was depressed and felt hopeless and nervous about the future. (Tr. 371). MHMR recommended that Case attend cognitive behavioral therapy but Cased failed to show up for his appointment on two occasions. (Tr. 369-71). On November 17, 2009, Case presented to MHMR in crisis and reported frequent suicidal ideations, stating that he wanted to "end it all." (Tr. 367). Pursuant to this visit, Case was approved for admission into the crisis intervention unit (CRU). (Tr. 366-67).

On November 19, 2009, the CRU evaluated Case and found that he has a history of suicidal ideations, with one attempt in 2002,[2] and that this episode of ideations was triggered by a fight with his grandmother. (Tr. 359). The severity of his depression was gauged at a 9 on a 10 point scale. (Tr. 360). A progress note dated November 20, 2009, elaborates that the fight with

---

[2] Consultative exam report indicates that between age seven and 2002, Case was hospitalized on three occasions after suicide attempts or gestures. (Tr. 210).

his grandmother was regarding drug paraphernalia that she found, and resulted in Case and his brother being kicked out of the grandmother's home. (Tr. 358). On November 25, 2009, the CRU re-evaluated Case and found that his depression severity was a 7 on a 10 point scale, and that he had some passive suicidal ideations. (Tr. 353). The December 2, 2009, CRU evaluation reports that Case had an increase in suicidal ideations over the preceding days and again rated his depression at a 7 on a 10 point scale. (Tr. 349-50). The next day (10/3/2009), Case was discharged from CRU; "[h]e denied suicidal/homicidal ideations and signed a crisis response plan." (Tr. 347). Progress notes from February 2010 stated that Case was "making fair progress in recovery of depressive symptoms." (Tr. 334, 336, 337).

In an evaluation by MHMR physicians conducted in March of 2010, Case admitted that his depression symptoms were better after restarting Effexor, the physician rated the depression at a 5 on a 10 point scale. (Tr. 331-32). Progress notes for the remainder of 2010 indicate that Case was making a good recovery from depression, and his depression severity level fluctuated between a 4 and a 5 on a 10 point scale. (Tr. 314, 316, 317, 319, 322, 325).

On September 18, 2009, Case appeared for a psychiatric consultative examination, pursuant to a DDS referral. (Tr. 209-15). At this appointment, Case "wore a back brace, limped, and walked with a cane, and he appeared to have difficulty arising from his chair." (Tr. 209). "While doing his paperwork . . . [Case] frequently moaned and made numerous complaints of pain." (Tr. 209). Case also reported that he was "unable to sit or stand 'for too long' or to lift anything that weighs more than ten pounds without hurting his back." (Tr. 209). He also replied that he had never heard of the Department of Assistive and Rehabilitative Services (DARS)

when asked if he sought vocational rehabilitation.[3] (Tr. 209). Notably, the consultative examiner (CE) states "[t]he claimant's approach to objective personality testing was marginally consistent, but he appears to have grossly overstated or fabricated symptoms of mental disorders, and testing appears to be indicative of malingering. The obtained test profile is, therefore, invalid." (Tr. 211). The CE also observed that Case "appeared to exaggerate his discomfort." (Tr. 211). In a September 2009 psychiatric review technique, Dr. Susan Thompson opined that Case only had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties maintaining concentration, persistence or pace, and no episodes of decompensation of extended duration. (Tr. 226).

In her RFC evaluation, Dr. Kim Rowlands, M.D., opined that Case could occasionally lift or carry 50 pounds, frequently lift or carry 25 pounds, stand or walk a total of 6 hours in an 8-hour workday, sit for a total of about 6 hours in an 8-hour workday, push or pull an unlimited amount, other than as shown for lift or carry restrictions. (Tr. 231). Dr. Rowlands also opined that Case had no postural limitations, no manipulative limitations, no visual limitations, no communicative limitations, and no environmental limitations. (Tr. 232-34).

## Standard of Review

A person is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 1382c(a)(3)(A), 423(d)(1)(A) (2012). Additionally, a claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age,

---

[3] Although Case stated to the Consultative Examiner that he had never heard of DARS, records from MHMR indicate that Case completed forms (with assistance) sent to him by DARS returned it to the Department on January 13, 2010. (Tr. 340).

education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *see* 20 C.F.R. §§ 404.1505, 416.911. "'Substantial gainful activity' is work activity involving significant physical or mental abilities for pay or profit." *Masterson v. Barnhart*, 309 F.3d 267, 271 n.2 (5th Cir. 2002); 20 C.F.R. § 404.1572(a)-(b) (2013).

To evaluate a disability claim, the Commissioner follows "a five-step sequential analysis to determine whether (1) the claimant is presently working; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment listed in Appendix 1 of the Social Security Regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the impairment prevents the claimant from doing any other substantial gainful activity." *Audler v. Astrue*, 501 F.3d 446, 447–48 (5th Cir. 2007); *see also* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The claimant bears the burden of showing he is disabled through the first four steps of the analysis; on the fifth, the Commissioner must show that there is other substantial work in the national economy that the claimant can perform." *Audler*, 501 F.3d at 448. Before proceeding to Steps 4 and 5, the Commissioner must assess a claimant's RFC. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). RFC is defined as "the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

This Court's review of the Commissioner's decision to deny disability benefits is limited to an inquiry of whether substantial evidence supports the Commissioner's findings, and whether the Commissioner applied the proper legal standards. *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002) (citing *Estate of Morris v. Shalala*, 207 F.3d 744, 745 (5th Cir. 2000)). Substantial evidence "is more than a mere scintilla and less than a preponderance" and includes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Masterson*, 309 F.3d at 272; *Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002). To determine whether the Commissioner's decision is supported by substantial evidence, the Court weighs four elements of proof: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the Claimant's subjective evidence of pain and disability; and (4) the claimant's age, education, and work history. *Martinez v. Chatter,* 64 F.3d 172, 174 (5th Cir. 1990); *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991). If substantial evidence supports the Commissioner's findings, then the findings are conclusive and the court must affirm the Commissioner's decision. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422, 28 L. Ed. 2d 842 (1971); *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000). The court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for the Commissioner's, even if the court believes that the evidence weighs against the Commissioner's decision. *Masterson*, 309 F.3d at 272. Moreover, "'[c]onflicts in the evidence are for the Commissioner and not the courts to resolve.'" *Id.* (quoting *Newton*, 209 F.3d at 452).

## Discussion

At issue in this appeal is (1) whether the ALJ failed to properly "develop the record by not obtaining a medical source opinion from either Dr. Herren or Dr. Gleason concerning [Case's] physical impairments and their resulting limitations"; (2) whether the ALJ erred in failing to obtain a consultative exam; and (3) whether the ALJ erred in relying on the testimony of the vocational expert (VE) at Step 5 and finding that Case could perform other work existing in significant numbers in the national economy.

After considering the record as a whole, the ALJ followed the five-step sequential evaluation process and determined that Case was not disabled within the meaning of the Social Security Act. (Tr. 16-28). At Step 1, the ALJ found that Case did not engage in substantial

gainful activity at relevant times. (Tr. 18). At Step 2, the ALJ found that Case "ha[d] the following severe impairments: status post herniated disc in the lumbar spine with back pain, depression, and anxiety." (Tr. 18). At Step 3, the ALJ found that Case did not have an impairment or combination of impairments that meets or equals one of the listings under the applicable regulations. (Tr. 22-24). Before proceeding to Steps 4 and 5, the ALJ assessed Case's RFC and determined that he retained the ability to

> [p]erform a wide range of sedentary work. . .. He would be able to lift and carry from 5 to 10 pounds; he could walk and/or stand up to 2 hours in an 8-hour workday; and he could sit for 6 hours in an 8 hour workday. He can occasionally bend forward at the waist; occasionally bend at the knees to come to rest on the knees, and occasionally able to bend downward by bending legs and spine. He would require a sit/stand option to change positions every 30 minutes. He has nonexertional limitations of being able to remember, understand, or carry out only simple 1 to 2 step instructions. He is able to sustain concentration necessary for unskilled work.

(Tr. 21). At Step 4, the ALJ determined that Case could not perform any past relevant work. (Tr. 26). Finally, at Step 5, the ALJ found that Case's impairments did not prevent him from performing work that existed in significant numbers in the national economy, and thus, Case was not disabled. (Tr. 27).

### A.   The ALJ did not Fail to Develop the Record by not Obtaining a Medical Source Statement from Case's Physicians

The ALJ has a duty to develop the record before making a disability determination. *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995); 20 C.F.R. § 404.1545(a)(3). The obligation to develop the record "is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Thompson v. Colvin*, No. 4:12-CV-466-Y, 2013 WL 4035229, at *6 (N.D. Tex. Aug. 8, 2013) (quoting *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001)). An allegation that the ALJ failed to fully and fairly develop the record is a substantial evidence issue. *See Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996).

Remand on grounds of lack of substantial evidence should not issue unless the "claimant shows (1) that the ALJ failed to fulfill his duty to adequately develop the record, and (2) that the claimant was prejudiced thereby." *Brock*, 84 F.3d at 728 (citing *Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir. 1984)); *Bowling v. Shalala*, 36 F.3d 431, 437 (5th Cir. 1994); *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000). A claimant successfully establishes prejudice by showing that if the ALJ would have fulfilled his obligation to fully develop the record, additional evidence would have been produced, and "that additional evidence might have led to a different decision." *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000) (quoting *Ripley*, 67 F.3d at 557 n. 22); *Carey*, 230 F.3d at 142.

Generally, an ALJ "should request a medical source statement describing the types of work the [claimant] is still capable of performing." *Ripley,* 67 F.3d at 557; 20 C.F.R. § 404.1513(b)(6). However, the absence of a medical source statement will not be fatal so long as the remainder of the record provides substantial evidence for the ALJ's determination. *Ripley*, 64 F.3d at 557. "To be substantial [evidence], such evidence cannot be exclusively medical, but must focus precisely on effects that medical impairments have on an applicant's ability to work." *Browning v. Barnhart*, No. 1:01-CV-637, 2003 WL 1831112, at *6-7 (E.D. Tex. Feb. 27, 2003) (citing *Ripley*, 64 F.3d at 557).

Case argues that "the ALJ failed to request a medical source statement from [Drs. Herren and Gleason] despite being the only physicians of record to have examined [Case] after his disability onset date," and that this fact supports a remand for further development of the record. (Pl.'s Br. 9-10). Case further alleges this failure to obtain medical source statements from Drs. Gleason and Herren, forced the ALJ to make impermissible medical conclusions in reaching his

RFC determination.[4] (Pl.'s Br. 10). True, the record does not contain medical source statements provided by Drs. Herren and Gleason. However, this fact, alone, is not fatal to the ALJ's decision. Moreover, although Case pleads for remand, he fails to show the Court that he was prejudiced by this failure. Case also fails to show that the additional evidence excluded by the failure to develop—in this case, the medical source statements—might have led to a different decision. Although a showing of prejudice must be made to obtain a remand on this issue, this Court will nevertheless conduct an inquiry into whether substantial evidence supports the ALJ's RFC determination.

The evidence available for the ALJ to consider contains extensive treatment records showing that Case suffered from chronic back pain and psychiatric issues. (Tr. 200-08, 238-70, 273-371). The record also contains a physical RFC assessment by a Disability Determination Services (DDS) employee (Tr. 230-37), a psychiatric consultative exam (Tr. 209-15), and case analyses of Claimant's physical and mental capabilities. (Tr. 271, 272). From this evidence, and other relevant evidence in the record, the ALJ concluded that Case was capable of performing a wide range of sedentary work. (Tr. 24-26).

While the medical records from Drs. Herren and Gleason are voluminous, neither contains any reference—explicit or implicit—as to what effects Case's impairments have on his ability to work. (*see* Tr. 238-70, 287-92). Absent additional information on the record, these records would not substantiate the ALJ's RFC finding. However, the remainder of the record is not silent as to Case's RFC. Dr. Rowlands provided a medical source opinion on Case's RFC and provided ample support for her opinion. (Tr. 231-32). This opinion was later reviewed and

---

[4] Case's brief in support of this issue is unclear as to exactly which part of the ALJ's determination is affected by the lack of medical source statements. Because Case quotes language from the ALJ's RFC findings in support of this issue, the Court will construe the claim as an allegation that the lack of medical source statements affected the ALJ's RFC finding.

affirmed by Dr. Frederick Cremona. (Tr. 271). Dr. Thompson provided a medical source opinion on Case's mental functional abilities and provided ample support for her opinion. (Tr. 228). Despite giving these medical source statements—which opined that Case "could perform medium type work"— a greater weight, the ALJ nonetheless found that Case had the capacity to perform a wide range of sedentary work because he believed it was "more close to the medical evidence"—a decision that is wholly within his province. (Tr. 24-26). For these reasons, the Court rejects Case's first contention and holds that the record is not incomplete, the ALJ did not err in failing to obtain medical source statements from Drs. Herren and Gleason, and that there is substantial evidence to support the RFC determination.

**B.      ALJ was not Obligated to Obtain a Physical Consultative Examination**

A consultative examination is not required by statute. *Turner v. Califano,* 563 F.2d 669, 671 (5th Cir. 1977) (quoting *McGee v. Weinberger*, 518 F.2d 330, 332 (5th Cir. 1975)). The regulations provide that when the information needed "is not readily available from the records of [a claimant's] medical treatment source, or [the Administration is] unable to seek clarification from [the claimant's] medical source, [the Administration] will ask [the claimant] to attend one or more consultative examinations at [the Administration's] expense." 20 C.F.R. §§ 404.1512(e), 416.912(e).   Thus, "[u]nder some circumstances,. . . a consultative examination is required to develop a full and fair record." *Pearson v. Bowen*, 866 F.2d 809, 812 (5th Cir. 1989) (quoting *Jones v. Bowen*, 829 F.2d 524, 526 (5th Cir. 1987)). However, a consultative examination is not always necessary and "[t]he decision to require such an examination is discretionary." *Pearson*, 866 F.2d at 812 (quoting *Jones*, 829 F.2d at 526); *Gutierrez v. Barnhart*, No. 04-11025, 2005 WL 1994289, at *8 (5th Cir. Aug. 19, 2005). The Fifth Circuit clarified that a "'full inquiry' does not require a consultative examination at government expense unless the record establishes that

such an examination is *necessary* to enable the [ALJ] to make the disability decision." *Turner*, 563 F.2d at 671 (emphasis added); *Jones*, 829 F.2d at 526. Moreover, the claimant must "raise a suspicion concerning such an impairment necessary to require the ALJ to order a consultative examination to discharge his duty of 'full inquiry'" under the applicable rules. *Pearson*, 866 F.2d at 812 (quoting *Jones*, 829 F.2d at 526). Thus, when evidence in the record supports a conclusion that the claimant is not disabled, a consultative exam is not necessary. *Turner*, 563 F.2d at 671.

Case argues that the ALJ erred in failing to obtain a consultative examination to assess his physical impairments. (Pl.'s Br. 10-11). In so doing, Case cites to 20 C.F.R. § 404.1520b(c)(3) and 20 C.F.R. § 416.920b(c)(3), which state in relevant part: "[i]f . . . we have *insufficient evidence* to determine whether you are disabled, or if after weighing the evidence we determine we cannot reach a conclusion about whether you are disabled. . . [w]e may ask you to undergo a consultative examination at our expense. . . ." (Pl.'s Br. 10-11); 20 C.F.R. § 404.1520b(c)(3) (emphasis added); 20 C.F.R. § 416.920b(c)(3) (emphasis added). The language of these statutes does not obligate an ALJ to order a consultative examination in every situation. Rather, the ALJ must order a consultative examination only when the record contains insufficient evidence to make a decision. Although Case restates the rule correctly in his brief, he fails to actually plead insufficiency other than his already-stated RFC complaint, discussed and decided *supra*. Case also failed to show the Court that a consultative exam was necessary for the ALJ to discharge his duty of full inquiry. Because this Court has already found that substantial evidence supports the ALJ's decision, the Court rejects Case's second point of error and finds that the ALJ was not obligated to order a consultative examination.

**C.      The ALJ Properly Relied on the VE's Testimony at Step 5**

In his last point of error, Case argues that the ALJ should not have relied on the VE's testimony at Step 5 because the hypothetical posed to the VE was defective. (Pl.'s Br. 11-15). Case also argues that the hypothetical posed to the VE conflicted with the DOT and applicable social security rulings, and thus, the ALJ's reliance on the VE testimony elicited by the hypothetical was in error. (Pl.'s Br. 12-13). For the reasons below, this Court rejects Case's final point of error.

The Fifth Circuit has stated that hypothetical questions to a vocational expert need only include the limitations the ALJ finds the record supports. *Materson v. Barnhart*, 309 F.3d 267, 273 (5th Cir. 2002). A hypothetical question posed to a VE is defective and cannot be relied upon unless: (1) the hypothetical reasonably incorporates "all disabilities of the claimants recognized by the ALJ," and (2) "the claimant or his representative is afforded the opportunity to correct deficiencies in the ALJ's question by mentioning or suggesting to the [VE] any purported defects in the hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question)." *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994); *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001); *Glover v. Barnhart*, 81 Fed. App'x 513, 514-15 (5th Cir. 2003) ("Contrary to [claimant's] questions, the hypothetical questions posed to the [VE] by the ALJ were not defective, as the questions reasonably incorporated all of the disabilities recognized by the ALJ. . . . Counsel was also given the opportunity to suggest to the VE additional disabilities, including [ones] not recognized by the ALJ's findings."); *Guillen v. Astrue*, 584 F. Supp. 2d 930, 939 (W.D. Tex. 2008). Both conditions must be met in order to avoid reversible error. *Bowling*, 36 F.3d at 436. *Boyd* clarified the second prong, noting that a claimant's failure to highlight problems in a defective

hypothetical does not "automatically salvage[] that hypothetical as proper basis for a determination of non-disability." *Boyd,* 239 F.3d at 707; *Anderson v. Astrue*, No. 2:08-CV-165, 2011 WL 1641766, at *5 (N.D. Tex. Apr. 22, 2011); *Ellis v. Astrue*, No. 7:09-CV-70, 2010 WL 3422872, at *5 (N.D. Tex. Jul. 27, 2010); *Johnson v. Barnhart*, 285 F. Supp. 2d 899, 915 (S.D. Tex. 2003). Thus, "[o]nly where the testimony by the VE is based on a correct account of a claimant's qualifications and restrictions, may the ALJ properly rely on the VE's testimony and conclusion." *Guillen*, 584 F. Supp. 2d at 940. The assumptions made by the VE must be adequately supported by the evidence in the record. *Bowling*, 36 F.3d at 436; *Guillen*, 584 F. Supp. 2d at 940. Finally, "[t]o the extent that there is any implied or indirect conflict between the [VE's] testimony and the DOT . . . the ALJ may rely upon the [VE's] testimony provided that the record reflects an adequate basis for doing so." *Carey v. Apfel*, 230 F.3d 131, 146 (5th Cir. 2000). As the court in *Carey* artfully stated:

> [C]laimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing.

*Id*. at 146-47.

As discussed extensively above, the ALJ determined that Case had the RFC to perform a wide range of sedentary work with stated limitations.[5] (Tr. 21). Based on this RFC determination, the ALJ posed two hypotheticals to the VE. (Tr. 53-57). In the first hypothetical, the VE was asked to consider an individual who was the same age, had the same educational

---

[5] The ALJ determined that Case could "[p]erform a wide range of sedentary work. . .. He would be able to lift and carry from 5 to 10 pounds; he could walk and/or stand up to 2 hours in an 8-hour workday; and he could sit for 6 hours in an 8 hour workday. He can occasionally bend forward at the waist; occasionally bend at the knees to come to rest on the knees, and occasionally able to bend downward by bending legs and spine. He would require a sit/stand option to change positions every 30 minutes. He has nonexertional limitations of being able to remember, understand, or carry out only simple 1 to 2 step instructions. He is able to sustain concentration necessary for unskilled work."

background as Case, and "who possess[ed] the strength to perform a wide range of sedentary work [with only] occasional stooping, kneeling, and crouching. . . [and] an individual who ha[d] [a] sit/stand option that accommodated on a 30 minute basis." (Tr. 53). The ALJ clarified the sit/stand option to mean that the "claimant would sit for a period of time, half hour, then stand up at the work station, stretch, move around, sit back down after a couple of minutes, do that day in and day out around lunch and breaks." (Tr. 53-54). The ALJ went on to add that since "there [were] some assertions of some non-exertional limitations. . . [the claimant will be limited] to concentration necessary for unskilled work." (Tr. 54).  Based on this hypothetical, the VE opined that the hypothetical claimant could not perform any of Case's past work.

Case takes issue with the line of questioning where the VE asked for clarification on the frequency of sit/stand option:

> [VE]: Thirty minutes but more of the moving away from the work station than a break and lunch?
>
> [ALJ]: Right.
>
> [VE]: Okay.
>
> [ALJ]: Other than breaks and lunch, the claimant would be at the work station.

(Pl.'s Br. 11-12; Tr. 54). After this exchange, the VE opined that Case could perform the jobs of file assembler, stuffer, and surveillance system monitor. (Tr. 54-55). Case alleges that this exchange, where the ALJ clarified the sit/stand option, resulted in placing more limitations than initially stated in the hypothetical and the RFC finding. (Pl.'s Reply Br. 2). Case specifically argues, that this clarification conflicts with the definition of "sedentary work" because if followed, the hypothetical claimant would be sitting for more than the six hours prescribed in the ALJ's RFC finding and the regulations. (Pl.'s Reply Br. 3).

The ALJ then posed a second hypothetical, in which he directed the VE to assume the same vocational factors but added that "because of chronic and severe pain and discomfort, this individual would be unable to maintain presence at a work station for a full eight hour day. In fact, [the person] would be required to rest or recline two to three hours per day." (Tr. 55). Based on this hypothetical, the VE opined that there would be no work available to a hypothetical individual with those limiting factors. (Tr. 55).

On cross examination, the following dialogue between Case's attorney and the VE ensued:

Q: Only question I want to follow-up with, with the sit/stand option every 30 minutes, unskilled work, is that something that's normally provided and allowed to do in the jobs that are unskilled?

A: That's really one where you are more customarily you're seated, that's why I was very cautious about the assembly type jobs.

Q: Okay, is that according to the [DOT], they don't indicate that?

A: No, There's nothing there to suggest that.

Q: Okay, all right, so basically we will be talking maybe a special accommodation to do those types of things for unskilled work?

A: well either that and/or just the job lends itself to the point that you could do, I mean it's not necessarily a total special accommodation. I have reviewed these jobs and I have seen folks doing both.

This was the only exchange between Case's attorney and the VE at the hearing. (*see* Tr. 55-57).

The hypotheticals reasonably incorporate all of Case's limitations recognized by the ALJ. Case's attorney also had a real opportunity to correct any deficits he believed existed in the

hypothetical. In fact, Case's attorney seemingly attempted to correct a deficit on cross examination. Moreover, whatever deficiency may have been present in the ALJ's hypothetical was not so latent that it did not allow counsel an adequate opportunity to correct the hypothetical. Because the hypotheticals reasonably included all of Case's limitations and because counsel had adequate opportunity to correct any defect, there is no reversible error.

Case's second contention that the sit/stand option would require the hypothetical individual to sit for almost the entire day, and that this creates a contradiction between the VE's testimony and the DOT, is meritless. (Pl.'s Br. 13; Pl.'s Reply Br. 2-3). In her hypothetical, the ALJ stated that the hypothetical individual could perform a wide range of sedentary work and then stated limitations. The definition of sedentary work includes sitting *and* standing. *See* SSR 96-9p, 1996 WL 374185 (Jul. 2, 1996). The fact that the ALJ did not explicitly mention standing in her hypothetical does not make the hypothetical defective. Additionally, it can be inferred that the ALJ's clarification regarding the sit/stand option, where she mentions "sit[ting] back down after a couple of minutes," only refers to the times during which the hypothetical individual is in a seated position. Allowing this argument to proceed would go against *Carey* and permit Case to essentially comb the record for inconsistencies and present it as reversible error. Moreover, even if there was an implied or indirect conflict, the ALJ could, in fact, rely on the VE's testimony because the record "reflects an adequate basis for doing so." *Carey*, 230 F.3d at 164-47.

This point of error is overruled.

## Conclusion

For the foregoing reasons, the decision of the Commissioner is **AFFIRMED** and Case's

complaint is **DISMISSED** with prejudice. Any appeal shall be to the Court of Appeals for the

Fifth Circuit in accordance with 28 U.S.C. § 636(c)(3).

**SO ORDERED** this 4th day of September, 2014.


_____

**E. SCOTT FROST**
**UNITED STATES MAGISTRATE JUDGE**